Mr. Watkins, whenever you're ready. Oh, actually, I'm sorry. Why don't we wait just a second until they sit down. Okay, the podium's yours. Please, the court. Your Honor, qualified immunity bars Dr. Wigginton's due process claim against these individual defendants because at the time they reviewed his tenure application and made their recommendations in their decision, there was no clearly established law that would put them or any other reasonable university official on notice that those actions were unlawful. In fact, the law was so clearly established to the contrary that 20 years before Dr. Wigginton applied for tenure, this court held in the Spuler case that university officials formulating tenure decisions in the future would likely benefit from qualified immunity from these exact type of claims. And the law didn't change in the interim. That's exact. But the district court cites our published Harrington v. Harris case. Yes, sir. Which specifically says that a plaintiff may have a property interest in the rational application of a university merit-based policy. Your Honor, the defendants in the Harrington case didn't challenge the contention that there was a property interest in that policy. But the court assumed it and they won, so it's more than dicta, right? It's essential to the holding. But the court specifically said we need not consider that issue. There's no law in the case analyzing whether or not that merit-based pay policy actually gave them a property interest. And it was also not a tenure policy, Your Honor. The court's been clear that discretionary tenure policies put forth by public universities are a different creature. They affect the rights of university employees in a different way. And the Sixth Circuit line of authority cited by the district court in a footnote, how do you pronounce the rule? Help me out here. Purish case, I think. You'd say we shouldn't look at them or are they distinguishable? I think they're distinguishable in a couple of different ways, Your Honor. Number one, those are procedural due process cases. This is a substantive due process claim. What those cases say is that a plaintiff may have a minimal property interest for procedural purposes in a fair administration of their tenure process. But the Sixth Circuit goes on to define that as just the right to have an impartial person review their tenure packet, which isn't all that much different than what you would have under the tenure policy in place here. Your argument is the record is clear. There was an enormous amount of process given to him here. It's just there was a lot of divisiveness in the process. Well, the different people along the way certainly disagreed about the merits of Dr. Wiginton's tenure dossier. But as an initial matter, Your Honor, he hadn't shown any clearly established law that established that he actually had a property interest in the outcome of what the tenure procedure was going to be. Now, Dr. Wiginton – I'm sorry. No, no, no. You're right. But you moved for qualified immunity several times. You never came up on interlocutory appeal. Is that because other claims were out there? Your Honor, there were eight or nine different claims in this case, and they were all pending before the district court until I think the jury instruction conference on the fifth day of trial. So yes, Your Honor. The law, as the court knows, is clear that a non-tenured faculty member has no interest in continuing employment or obtaining tenure when there's a formal tenure policy in place. That's exactly what Dr. Wiginton alleged that he had. That's what his pleadings say he had. He said that he had five continuous years of positive evaluations by his department chairs, and that gave him a property right in tenure that the university deprived him of unconstitutionally when it denied him tenure. That's what he argued at trial. That's exactly what he told the jury in closing. He had an expectation of tenure, and he was denied that expectation when tenure was denied. Dr. Wiginton, he's changed horses now, and he argues that what he really has is not an interest in tenure but an interest in the fair administration of his tenure process. But that overlooks the fact that substantive due process bars certain governmental actions without regard to the fairness of the procedures that were used to implement them. Their brief points out you requested that the instruction that say literally irrational, that that was a request that you made. So that jury was supposed to decide was he treated irrationally. And when you read the record, and he has the two department chairs that for five of his six years are telling him, if it looks good, you're going to get it, and then the faculty vote that he gets it, and then the two university-wide committees, you know the record, that the jury hears about says this was really unfortunate. This was a problem. One group, I mean, the individuals were using the textbooks as looking for scholarship and teaching. It's hard to say that, oh, Wiginton changed his position. It looks like it's just at the very end the new chair changed his position, and that was endorsed all the way up. There's a level of regrettable irrationality even if you end up right that there's no property interest. Well, Your Honor, so the rational – this is due process rational basis review. The question is did these individual defendants who were sued in their individual capacity for damages act in a manner that was without professional judgment? Was their action literally irrational? And the record is clear and undisputed that at the time they reviewed these tenure applications, each of these defendants created a detailed contemporaneous writing that explained what their reasons were. And the court's not concerned with whether the reasons were good reasons or bad reasons or reasons that are consistent with what somebody else believed. It's were there reasons. Dr. Wiginton put those documents in the record. He never argued that those weren't the reasons that they gave him. He never argued that those weren't those individuals. But the university-wide appeals committee said what happened is that the horse was switched midstream. Your Honor, they did point to the fact that he received those five positive annual evaluations, but those facts are the exact same as the facts in the Staley v. University of Mississippi case where the geology professor's department chair told him don't worry about scholarly writings. What you need to do is focus on presenting at professional conferences to bolster the reputation of this department. Ultimately, he had a new department chair come in at the end of his tenure process who looked at his record and said you haven't done the requisite amount of scholarly work under the policies that apply. Dr. Wiginton knew from the first morning of his employment as a tenure track professor that his department chairs were not going to make the tenure decision. He knew from the first day of his employment that there were three different tenure policies and that he had to satisfy the requirements of each of those policies. He knew that his current department chairs might not even be the department chair at the time he was up for review. Your conclusion is all three levels of policies are congruent? They're not inconsistent with one another either textually or as applied? I don't think it's inconsistent, Your Honor, to say that you have to comply with all three of the policies. Now, if Dr. Wiginton was given instructions by department chairs that said ignore the requirements of one policy that's above ours, we're saying you don't need to publish scholarly works, then that just puts us back in the Staley position. Dr. Wiginton knew that his department chairs weren't going to be the ones responsible for looking at the application of the school-level policy or the university-level policy. That's what a dean does when he reviews it. That's what a provost and a chancellor do. They look at all of the policies put together and consider all of those things. He shouldn't have relied on those assurances. That's correct, Your Honor. There was no basis for him to rely on those assurances, certainly not to the extent that they gave rise to an expectation of tenure or a protected property interest in this case. A property interest only arises when there are mutually explicit understandings, or in this context, there have to be substantive limits on official discretion. So you look to the contracts and there weren't. Assuming that the tenure policies were incorporated into Dr. Wiginton's contract somehow and that Dr. Wiginton had some right to rely on what they said, nothing in the policies limits the discretion of the chancellor or any of the other recommending officials in how they make that decision. To the extent he argues he had a right in the policies or the procedures themselves, there's no dispute in the record that all of the procedures and policies happened. All the committees convened. All the recommenders gave their recommendation. The chancellor rendered a decision. And Dr. Wiginton was allowed to submit an appeal to the IHL board. All of those things happened. There's no substantive right in it. Finish the story. Then the appeal board said, listen, he clearly has been misadvised for years and years, so why not give him another year to now do the scholarship that he wasn't ever told he had to do. Wasn't that the final committee's recommendation? Give him another year because we're sort of responsible for this mess. That was not the final word, Your Honor. It wasn't the final word, but it was the final university-wide appeals committee assessing how he'd been treated. Well, it's important to look at, Your Honor, what the appeals committee was charged to do. The appeals committee was not charged to review the merits of a tenure application. They expressed no opinion about whether or not he should or should not have been entitled to tenure. The appeals committee looks to see whether the procedures had been followed, whether the people below who were supposed to make decisions were looking at the evidence when they made those decisions. The appeals committee actually said that that had happened. They said we acknowledge that Dr. Lambert, the department chair, and all these other people in the recommending chain actually looked at his record, and that's what they based their decisions on, but we also think that it's unfortunate that he had this advice from his department chairs and maybe he should be given another year. So that goes up as a recommendation to the chancellor. The chancellor is charged to review the merits of the tenure application. The chancellor does have to make that final recommendation. Now, he has the appeals committee's report before him. It's undisputed that he reviewed it. In his tenure memo, he specifically explained why he was declining to follow those recommendations, but he had it before him when he made the final merits decision. As an example, Your Honor, if the appeals committee finds in a hypothetical tenure case that some member of the chain of review had personal malice toward a tenure applicant, which is one of the other bases that the appeals committee is charged to consider, and that recommendation goes up to the chancellor, and the chancellor looks at it and says, gosh, that's concerning to me that a department chair or dean might have personal malice toward an applicant, but I'm still charged to look at the merits of the application and decide whether or not that person is entitled to tenure, and he might not be qualified for tenure regardless of what the department chair thinks of him. So if the chancellor actually took that information and looked at it and reviewed it, and again the proof is undisputed that he did, it's not a substantive right to the outcome of his decision that there was a lower body that was considering whether there was a rational basis in the chain coming up. And on top of all this, Your Honor, the standard is even higher in this case, both because this is a purely academic decision that the courts are wary of wading into and because it's a qualified immunity case. There is simply no clearly established law out there that either establishes the property right that Dr. Whittington now argues he has or would hold that any of the conduct of which the defendants were accused was unlawful. Now when the district court did, it only finally wrote on this issue, the property right at the final qualified immunity request, correct? After trial, yes. After trial, and it cited the case we started talking about, but what other case law did it rely on to describe a property right? The district court cited two other cases, the Honor A.V. Douglas case and the Spuler case that I mentioned a minute ago. The Honor A.V. case involved an alleged policy of automatic tenure. The professor in that case said if I serve seven years, I get tenure. Well, that's not applicable here to a discretionary tenure policy because an automatic tenure policy would place substantive limits on official discretion. It would mandate an outcome if certain predicates were actually met. The Spuler case, the district court was correct that it set forth the elements of a substantive due process claim. It said if you have a protected property interest, you can't be deprived of it in an arbitrary and capricious manner. But it's also held that the tenure applicant in that case had no constitutionally protected property interest, that the defendants in that case provided a rational basis for their decision. In that case, it's that there were financial reasons. They couldn't continue paying for a graduate program and tenure this professor for life and held that they were entitled to qualified immunity before going on to say that in the future, similar academic decisions are going to be subject to qualified immunity from these claims. So none of those cases provide fair warning or a clear and unambiguous warning to the defendants that you can't make a negative recommendation of tenure after you review this applicant's tenure dossier. They say exactly the contrary, and that's particularly true when you look at the specific laundry list of things that Dr. Wiginton claims were arbitrary in this case. There's no clearly established law, for example, that holds that a university president must award tenure when a department chair or a series of department chairs gives positive reviews. The Staley case says exactly the opposite of that. There's no clearly established law that says that a dean or a department head must agree with the recommendations of an outside reviewer or may not critique their qualifications. There's no law that says that a scholar, an academic who is reviewing academic works, can't look at a citation index like Google Scholar or one of the others that Dr. Lambert looked at to determine whether or not the applicant has ever had his academic works cited by any other scholar, which had not, in fact, happened in this case. There's no dispute about the fact that that didn't happen. There's no dispute about the number of peer-reviewed journal articles Dr. Wiginton had actually published. There's no dispute about the type of research he did, what the nature of the grants were that he said he applied for. All the facts that Dr. Lambert and the other administrators relied on were not in dispute. Dr. Wiginton just disagreed with the way they applied their judgments. He thought they should have given more weight to his textbook chapters. He thought they should have given more weight to the border patrol project that he did. They didn't. It was within their discretion to do that, and nothing in the university's policy constrained that discretion in any way at any point along the chain. Thank you, counsel. You have time for rebuttal. Thank you. Mr. Flicker. Thank you. It's my pleasure to be here. First time for me. I appreciate the opportunity to speak to everybody. Let's all remember that, in fact, there was a five-day trial here with nine witnesses, thousands of pages of documents, a long-established, well-established system by Ole Miss, the University of Mississippi itself, to prevent arbitrary and capricious action by the people, the entire chain of administrators, that rule on whether or not tenure is to be given. I have to, unfortunately, vehemently disagree with the position that at the end of the case we changed our position. We never felt that tenure was guaranteed or a property right. It's not in Mississippi. There's no question about that. As a matter of fact, there were four motions to dismiss the complaint by the school, a motion for summary judgment after discovery, further motions at the trial, all based on the same misconception that we argued and that Judge Biggers himself noted very well. Counsel, help me out on that because it seems to me that the decision to give tenure is subjective at its root. I mean, there's no guarantee of it. The case would be easy if there were a checklist or a list of items with boxes that a professor or an employee could go and accomplish. So we don't have that here. Help me out on what it is that that decision-making process, what about it, makes it actionable. We don't say that Wiginton was entitled to tenure because he had no property right or contract right to tenure, to further employment. What is clear is that he had to apply for tenure, and he had otherwise. But it's the process that is the gravamen of the complaint, isn't it? Exactly correct. So tell me, I guess what I'm asking is what about the process, what shortcomings were there that makes this actionable? If tenure is not something that's a contractual guarantee or an entitlement, what about the process makes its violation actionable? The process that the school had was fine. The process had lots of protections in it. If they were implemented without arbitrary and capricious actions by the administrators that eventually ruled on it, and if in fact, in quotes, a fair day was given, and if in fact, the actions of these administrators was not literally irrational, as the jury found. But isn't we do have to find he had a protected property interest? Yes, he had a protected property interest through the contract for a process of determination that was free of arbitrary and capricious decision-making. And I'm going to interrupt you there because I need, what's your best legal authority for that proposition that put them on notice? And also, quote for me from his employment contract or even these guidelines where it gave him just that right. It seems intuitive someone will be treated fairly, but I thought these guidelines all explicitly give Ole Miss and the Chancellor complete discretion right to the end. No. No? No, they don't. They don't. All right. The document itself says good faith will be exercised by the administrators in making the determination. Not that the determination will go in Wiginton's favor, but that good faith will be exercised. Good faith, fairness, he had a right to, he had to comply with the school's system, as you said, the process, which we did. They didn't. Built into the system, and it's just not intuitive that it was supposed to be fair. Look at the process along the way. Well, before you get to that, there's the other part of my question. What is the case? Because the cases relied on, but the district court don't seem to stand for the proposition that someone in tenure track has a property interest in good faith treatment. What's the case that says that? We talk about the honor, if I'm saying it right, the honorary. I couldn't pronounce it either, but that really is the absence altogether. Understood. So what's the next case? In 1992, the Klingler case, that under Mississippi law, non-tenured employees' contract rights do constitute enforceable property interests. That's this court, of course, in 2000. But isn't that subsequent to the incident here, isn't it? No, no, no. 2000 is the decision in the Klingler. Klingler? That's the one unpublished? It is not subsequent, sir. Let me say it this way. I'm relying on the Spuler case. I'm relying on the Klingler case. And these were both before. Klingler, in the end, the plaintiff lost, correct? But no case ever went to trial. Let me say what I think is going on as far as is there any authority that says somebody like Wiginton has that, in the tenure process decision, he has that right for the decision to be made by the administrators free of arbitrary and capricious action? No, because it hasn't come to you yet. All of this has led to the point where this court has accepted and Mississippi law establishes a contract right if you have external documents like the employee manuals or these three different university policies. But it would have to really, I mean, it could be very unfortunate to be given inconsistent advice. But if his contract had read if you are nominated for the Crow award or whatever it is he got the nomination for, you will get it. That constrains discretion. It seems like under Honore and others at that point he's got a minimal property interest. But here what it said was there are these three competency categories and it's discretionary all the way throughout. And then chancellor can say no matter how good you are, the interest of the university. But that's not really the issue. The issue is not that they have a lot of discretion. They have all discretion. But just like in other types of law, you can't discriminate, which is not the case here. But you have all discretion to do what you want. You can't discriminate. Here you can't act arbitrarily and capriciously and with literal – I lost the term. Literal irrationality. Thank you very much. With literal irrationality. The point being they didn't create all of the – they acknowledged it, too, for their council to say they can do whatever they want, which is what the judge once asked. And we can do whatever we want. That is not how this system, the school itself, understands they can't. This is why they have different committees along the way advising different administrators along the way. There's five administrators along the way that ruled on this before it went up to the board. There were two committees, the Tenure and Promotion Appeals Committee and then the Tenure and Promotion Review Committee, each of which found, firstly, that it looked like this was arbitrary and capricious, which their provisions prevent. Their rules say you cannot act arbitrarily or capriciously. You said that in your brief, too, but when I go to the record, the first committee, I thought, specifically left arbitrary and capricious blank. No, they didn't. They checked it off, actually. They checked off arbitrary and capricious. One of the people on that committee checked off arbitrary and capricious. We brought that witness in, and she testified to that at the trial. The second committee, which you also described as having found it to be arbitrary and capricious, I thought, and he stated this orally, the second committee specifically said it wasn't in one sense, in that the individual determinants had reason to deny it. But then they said in another sense it was a problem because he had been given misadvice. They gave, it's not so much the misadvice, and I don't want the case to fall on the grounds that, oh, he had good reviews, and therefore he was entitled to tenure, or that the administrators were obligated to find tenure. No, not at all. That is not my position. Whatever he got below, and the judge called them glowing reviews, and we put it into evidence, fine. It is not by itself anything other than possibly an indication that what's really going on here is that their rulings, the administrators, was arbitrary and capricious and literally irrational because they wanted to get rid of practitioners like Dr. Wiginton. Dr. Wiginton, and it is relevant, Dr. Wiginton is a highly decorated law enforcement official. He was a New Orleans cop. He was a state of Louisiana officer. He worked for the Customs Service and the DEA efforts in Miami. The man was a true practitioner hero. When the new administrators came in, first the dean of the school, Burton, he made it clear, and the testimony is there, he wanted to get rid of practitioners as the light for this school. He wanted academics. He wanted to get rid, and he was the first guy, Wiginton was the first person up for tenure under this new rule. Burton, Lambert, came in under Burton as the chair. Lambert wrote this unheard of position, totally opposite of what every other chair and dean in this department and school had ever ruled on. Fine, they can do what they want, but they have to not use their newfound standards or their selective determinations as a cover for what they really wanted, which was to get rid of practitioners. The jury accepted that and understood that. Because these are defendants and individuals in this case, I tried to read very closely the record cites you gave for those assertions, particularly against Mr. Burton, and you did cite your cross of him for the notion that he wanted to get rid of police officers. When I read that cross and the pages you get, it didn't seem like you elicited that. In other words, you said you're saying you don't like cops, cops are stupid, they can't read, and Dr. Burton never ever said that. Dr. Burton did say, sir, that cops are not as smart. No, he said cops should be able to read the rules. In what context? That it was up to the cop to understand not to follow what his chairs had told him as to what the standards for scholarship were, but for him to determine whether or not the broader university standards applied or the less broad but still broader. My point to you is, when you say in the brief, as you are now, that Burton and these defendants wanted to get rid of him or thought cops weren't good enough, I really need an exact record site. Can you give me one now? You must remember, because you had him on trial, would it be your cross of Mr. Burton? Is that the closest you got? It's in the – of course, of course. That's fine. Go ahead. I'll move on, but if I may just, of course, because I'd like to just make this one last – were precisely what the earlier department chairs had said would. But that's just a switch on guidelines. Well, a swing on the guidelines after the fact, but as far as this point what's in the record where Burton confessed his sins, of course not. We've all tried many cases. He never said, yes, it's true, Mr. Flicker, you're correct, I intended to get rid of him. No, but when you put it all together throughout the entire cross and Wiginton's testimony and the testimony I had the two chairs, prior chairs, in the courtroom – to testify, I should say, as witnesses – in their direct and in their cross they said he wanted – one of the witnesses actually said – yeah, he said to his secretaries, and I overheard it many times, he wanted to get rid of these practitioners. Does that mean that Burton confesses his sins? No. But the understanding is that that's what they wanted. They changed so many of the rules and the paradigms. Like you said, all of a sudden textbooks don't count. All of a sudden the Google Scholar is a metric. All of a sudden his speaker – he should have spoken at fancier, in quotes, fancier conventions. All of a sudden whatever he did before didn't count. What? It's all part of the overall picture that they did whatever they could. I don't want to make it the super conspiracy of the ages, but it's pretty – You tried the case, and so this is – we have the record. I guess you saw a stumble, or at least I stumble. What's the best clearly established law that put them on notice that their rulings were constrained as to whether they could give tenure or not? You mean – I didn't follow that. I'm sorry. What authority would have told the University of Mississippi and these defendants that it's clearly established that someone seeking tenure has a protected property interest in being treated fairly as you describe the record? The guidelines for tenure and promotion by the school – remember, it's a mandatory process. The guidelines themselves say good faith will be exercised by the administrators in this determination. It doesn't say fair play. It doesn't say – it does say arbitrary and capricious. That's what these two committees were designed for, to identify whether any of their actions were arbitrary and capricious. Why? Because if the actions were arbitrary and capricious, then it wouldn't be a proper determination. That is what was said at the first level, and in the second level they pointed to what? They pointed to the textbooks. How about the external reviewers as an example? And I'm finally getting around to address you. The external reviewers – remember, the school's policies were we will pick the external reviewers. So Wiginton gave them a list of five. From that, Lambert himself took three, and then Lambert himself appointed two more. These are external reviewers that say – it's basically the equivalent of reference letters, good character reference letters. The school then challenged and denigrated and dismissed the value of the positive external reviews that Wiginton got because – why? They had no reason to. They themselves, the school itself, selected the reviewers, and then they challenged it. That was something that the second committee – excuse me, the appeals committee specifically noted. That's a very important fact. So it wasn't – again, I don't want to get lost, if I may, without repeating myself too much. I don't want to get lost on, well, he had an expectation of tenure because he had good reviews. Absolutely not. That's not our position. That fact that he had excellent reviews sort of fits into the points that you were asking me to identify, including the external reviewers, including the lack of fancy conventions he spoke at, including the textbook changes, including the fact that he was told to follow the department's plans and procedures. All of these is ten pieces of evidence that go to my point that it was just a pretext for them to act arbitrarily and capriciously and free of literal – it was literally irrational. The jury heard all of this. The jury judges the credibility of Burton. I appreciate you read the transcript. I read the transcript. It's the jury that heard every word. Whittington was on the stand for a day and a half. He had a lot to say. He wasn't on the stand for a day and a half under my questioning. He was under the questioning, of course, of the school. Burton was on the stand for a bunch of hours. The jury decided the credibility of the witnesses, and there's obviously no dispute, I would imagine, that it is the jury that decides the credibility. They accepted, as Judge Biggers himself said, the disingenuousness of the position of the school was clear to the jury. Again, does he – the qualified immunity – if I may – the qualified immunity argument, the right – not – these particular facts haven't been before you, I believe. It's been before the Sixth Circuit, and that's why the Sixth Circuit cases are cited. But you didn't bring a procedural due process claim. You didn't bring a procedural due process claim here. No. It's a substantive due process claim. Okay. And the substantive due process claim – So if the facts have never been before us or any court and this law is convoluted and split, which is how you described it to the district court, how could that ever be fair notice for purposes of qualified immunity? If only – first of all, if I may – the process and the procedures and the many hoops and levels of administrative process that had to go through, did they think – is it reasonable to think that it was proper action for the administrators to act arbitrarily and capriciously and irrationally and not exercise professional judgment in reaching their conclusion to deny tenure? Not that he had the right to tenure, but in the process he had that right. Once the school denies or abrogates its ability to terminate employees at will, which they had until they issued these guidelines for tenure and promotion, once they do that, that's blinding. And so we have the department chair at the end that says no. Then two deans say no. Then whoever the fourth person said no, and it gets up to the chancellor, no. There's no arbitrariness among every – all one of – and they're documenting their findings. On that point, it was pretty clear that the position we took was they were parroting it, and the testimony from five days of trial was that they did parrot it. As a matter of fact, one of the – I think it was Jones, the chancellor then, his testimony was, well, I'm a busy man. Yeah, I looked at it, I read it, but that's not the point. To take the position that because they completed reports, if you look at the reports, they are parroting. All of the actions they took, including the denial of the textbooks, including the rejection of the external reviews, including the Google scholar metric that never existed, including the obligation to do more than whatever he was told, including the rejection of the supports that he had, every one of them said the same thing. And because Lambert wrote it, he had a six-page report. By the time it got to the end, it was a page – it was the last administrator whittled it down to a page, repeating and parroting everything that was said. You made your argument forcefully here.  Thank you, Judge. So I guess his core argument is that the very manuals in place took away discretion, created a minimal property interest because they used the word good faith. Your Honor, on the same page that the words good faith appear, which says good faith is required in all facets of the process by all participants presumably, the policy says it's based on a series of qualitative judgments about the scholar's work and that even if they satisfy all of the criteria, even if they meet scholarship, even if they meet teaching, even if they meet service, it might not be a good fit. The finances might not be there. You're not guaranteed tenure even if you're qualified for it. That's the opposite of a constraint on discretion. Even if we don't like you? Correct, Your Honor. It says if you're not a good fit with the university. I mean if the decision goes up to the president and the president looks back at the employment file and finds that there's been an employee who's been in a fistfight with his department chair or something, it doesn't matter if he's written a hundred scholarly articles, it's going to be a problem for his tenure application. You're going to think twice about whether you want that person tenured for life to your university. But does it rise to a cause of action if the president decides I want academics, I don't want practitioners? No, Your Honor, it doesn't. It's not a cause of action? That was a theme that came up at trial. Mr. Flicker mentioned that a minute ago. If Dr. Burton had come in and said I want to focus on academics rather than practitioners, that's a rational basis. If that was part of his tenure decision and there wasn't any proof that that was an affirmative consideration that he made, but even if it was, that would also be a rational basis. The Wicks case that we've cited in our briefing from the Mississippi Supreme Court from Mississippi Valley State University says that the desire to upgrade a department in a tenure decision is in fact a rational basis. It is a reason. It exists. Mr. Flicker doesn't dispute that any of those tenure memos are out there. Again, he just doesn't like what they said. There's not a single case. Your position is we don't even get to the process and the facts, whether it was arbitrary and capricious, because there's no case that put you on notice that he had a property interest at all? That's correct, and I think that point has been conceded at this point, Your Honor. At best, there's not a case that has come before this court. I did want to point out that the Klingler case that we didn't talk about on the front end, I think that was a 2015 case. The tenure decision was 2014. That would have come after. It was unpublished and after the fact. And even if the court were to consider it, the plaintiff in Klingler said exactly what Dr. Wiginton said. Well, I'm not arguing that I have an interest in tenure. I have an interest in the process somehow. I have an interest in being able to participate in the process or work toward tenure. And this court said, no, you don't even have that because if you're not entitled to tenure, an opportunity to participate in the process leaves you in no better place than you would have been to start with. You can't switch trains and seek a different property interest. I do want to point out a couple of record sites. It's just not true that Dr. Wiginton never argued that he had an expectation of tenure or a property interest in tenure. His pleadings at page 475, opening argument page 3043, testimony of Dr. Wiginton page 3110, closing argument page 3928. That was the argument until it was inconvenient because the law didn't support it. So that was the theory that he argued this case on. Your Honor, the review committee, I did want to point out too, the actual report of the review committee is on page 2886 of the record. The checkboxes were not the report of the committee, and the individual who filled out the checkbox in question was not a witness at trial and did not explain what her checkboxes meant. The review committee, as did the appeals committee later, actually found that the reviewers in the chain up to that point were not arbitrary and capricious in their decision making, and that they had relied on the evidence in place at the time to make their decision. We've talked about the practitioner issue, the textbooks. To Your Honor's point that the guidelines switched on textbooks, that's not exactly what happened. If you look at Dr. Jones' testimony in his tenure memo, Dr. Jones testified specifically that textbooks can be evidence of scholarly work. There can be academic textbooks, but that he reviewed Dr. Wiginton's specific textbooks and found, as did the other defendants, that they summarized information for underclassmen in an undergraduate or community college context, and that they did not contribute to the field of scholarship that Dr. Wiginton. He's the author of the textbooks or chapters within textbooks? He is a co-author. I think he testified he authored between two and four chapters in four or five different textbooks. They were instructional in nature and for use in the classroom. Thank you, Counsel. Thank you, Your Honor. The case is submitted.